**O.C.T.G., L.L.P and Sojourn Partners, L.L.C., Appellants**

v.

**LAGUNA TUBULAR PRODUCTS CORPORATION and LTP Real Estate, LLC, Appellees**

**NO. 14-16-00210-CV**

Court of Appeals of Texas, Houston (14th Dist.).

Opinion filed June 6, 2017

Melissa Moore, Staton Michael Childers, Curt Hesse, Brianne Watkins Richardson, Michael Anthony Descioli, John P. Cahill, Jr., JoAnn Storey, Houston, TX, for Appellants.

Brett Solberg, Christina E. Ponig, Houston, TX, for Appellees.

Panel consists of Justices Busby, Brown, and Donovan.

## OPINION ON MOTION

Marc W. Brown, Justice

Appellant O.C.T.G., L.L.P. (OCTG) moved for review of the trial court's net worth determination pursuant to Rule 24 of the Texas Rules of Appellate Procedure. Appellee Laguna Tubular Products Corporation (Laguna) filed a response. For the reasons stated herein, we require that the amount of security necessary to supersede the trial court's judgment be decreased and remand to the trial court for that determination. To this extent, we grant in part the Rule 24.4(a) motion filed by OCTG; otherwise, we deny this motion. We lift our stay of execution on the trial court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Trial Judgment & Supersedeas Bond

This case stems from a contract dispute. After a trial on the merits, the trial court signed a final judgment in favor of the plaintiffs/appellees. The trial court ordered that Laguna recover from OCTG: (1) actual damages of $1,562,127.00; (2) prejudgment interest of $181,646.08; and (3) court costs and post-judgment interest. The trial court also ordered that LTP Real Estate, LLC, recover from Sojourn Partners, L.L.C. ("Sojourn"): (1) actual damages of $405,000; (2) prejudgment interest of $47,093.91; and (3) court costs and post-judgment interest.

Following entry of judgment, both defendants deposited cash in lieu of a supersedeas bond. Sojourn deposited one cashier's check for actual damages and interest, and OCTG deposited a cashier's check for one-half its claimed net worth ($168,638.14), along with a net-worth affidavit. After the clerk accepted the bond, Laguna objected to the net-worth affidavit. OCTG responded to the objection and alternatively moved to reduce the amount of supersedeas bond based upon substantial economic harm.

### B. Net-Worth Hearing

In June 2016, the trial court held an evidentiary hearing on Laguna's objection to OCTG's net-worth affidavit. OCTG called its general counsel and CFO, David Cragle, as its first witness. Cragle testified that he prepared the affidavit with respect to OCTG's net worth, in which he stated OCTG's net worth was $337,276.27 as of January 31, 2016. Cragle stated that, in addition to current assets and liabilities, OCTG's detailed balance sheet included the amount of the judgment, prejudgment interest, and costs and legal fees associated with the instant case as a contingent

liability. According to Cragle, under generally accepted accounting principles (GAAP),[1] both contingent liabilities and contingent assets need to be included if the loss or gain is "probable." Cragle cited Accounting Standards Codification (ASC) 450, which provides: "An estimated loss from a loss contingency is recognized only if the available information indicates that (1) it is probable that an asset has been impaired or a liability has been incurred at the reporting date and (2) the amount of the loss can be reasonably estimated." Thus, according to Cragle, when the judgment in this case was rendered in December 2015, it became a probable liability.

According to Cragle, OCTG's net worth "substantially deteriorated further" after he prepared the January affidavit. Without reconciling the accounts for the month of May, Cragle testified that OCTG had a current loss for the year of approximately $1,668,000. Cragle noted the downturn in the oil and gas industry and stated that OCTG had downsized from a staff of about 250 to a staff of eight. OCTG did not run a single service job—threading or inspection—in May, and the only revenue line came from rack service charges. Accounting for the current losses, Cragle estimated OCTG's current net worth at the time of the hearing at approximately -$938,000.

Cragle also addressed Laguna's contention that OCTG had a net worth of approximately $6.5 million as of May 2015. According to Cragle, May 2015 was OCTG's last operational month to produce positive results and the second half of the year saw approximately $1.3 million in net losses. Additionally, OCTG wrote off prior investments in oil and gas-related projects that

had "effectively become worthless," which accumulated to approximately $600,000. Finally, the judgment in this case further diminished OCTG's net worth.

Cragle testified as to attempts made by OCTG to secure a bond in this case in the full amount of $1,875,000. According to Cragle, OCTG "scoured lending sources" both before and after the trial. Once the judgment was rendered, OCTG contacted its commercial insurance broker for assistance in obtaining bonds. Despite multiple attempts with multiple bond underwriters, no one would underwrite a bond unless OCTG provided cash or an irrevocable letter of credit in the full amount, which Cragle testified OCTG could not do. According to Cragle, lenders would not loan funds to OCTG because the company did not have "sufficient cash flow."

Cragle further stated that OCTG used its available cash to pay employment wages, taxes, worker's compensation insurance "and the like" in order to remain operational. Cragle also testified with regard to OCTG's assets serving as potential security for obtaining funds to post bond. According to Cragle, significant assets are pledged to Capital One and Wells Fargo. Cragle conceded that some assets—namely, equipment—were not pledged currently, but they were essential to conducting business and also difficult to sell given their specialized nature.

Cragle also testified that even if OCTG could somehow post the security required to supersede the judgment, it would be rendered unable to pay for the appeal from the judgment.

On cross-examination, Cragle noted that he serves as general counsel for the

---

1. GAAP is short for "generally accepted accounting principles." The Financial Accounting Standards Board (FASB), a non-governmental body of the Securities and Exchange Commission, was charged with establishing standards of financial accounting that govern the preparation of financial reports. FASB codified thousands of pronouncements comprising GAAP for the United States into a single source. http://www.fasb.org/facts/

"group" that includes OCTG, Tubular Ultrasound, Sojourn Partners, Tejas Gas, and ZEN Oil, as well as a few, smaller project companies. According to Cragle, these companies generally have common control but not entirely common ownership. In addition to Cragle, four other individuals have ownership interests in the various companies—David Siverling, Bill McWhorter, Bruce Maxfield, and Laura Cragle.

At the request of their lenders, OCTG asked an independent accounting firm to review financial statements of OCTG and its affiliates as of December 31, 2013, and prepare consolidated financials. Cragle conceded that a reviewed financial statement is not as reliable as an audited financial statement.

Cragle also testified that Tubular Ultrasound and ZEN Oil, the two upstream 50 percent owners of OCTG, are guarantors on the Capital One indebtedness. However, the guaranty is not booked on any of the balance sheets because it has not been called. Cragle also stated that he has personal guarantees on the Wells Fargo indebtedness. McWhorter and Siverling also have personal guarantees as to Wells Fargo. Siverling additionally has a personal guarantee on all of the Capital One indebtedness.

Sojourn Partners owns the land and buildings from which OCTG's operations run. In addition to having a 50 percent interest in OCTG, Tubular Ultrasound has some legacy assets. ZEN Oil is Tubular Ultrasound's general partner and makes all of the management decisions. Siverling, who serves as president of OCTG, owns 80 percent of ZEN.

Cragle acknowledged that none of the eight remaining staff employed by OCTG would be involved in an inspection or threading job. If OCTG got such a job, it would have to create a crew by calling back previously laid-off employees.

When questioned about how OCTG was paying for selling, general, and administrative expenses (SG&A expenses) if the company had no revenue, Cragle explained they were using cash that was being collected still from prior service months. Additionally, they have loaned money from Sojourn Partners to OCTG to make up the difference in cash shortfalls.

Cragle testified that while he and his partners had discussed the possibility of one company providing OCTG with a capital contribution in order to pay the supersedeas bond, they were under no obligation to contribute capital, and "in light of the circumstances of the business and the existing market and the like, the answer is, we're simply not inclined to do that."

On redirect examination, Cragle emphasized that each of the interrelated companies is a separately formed and operated company, with separate charters and separate tax returns. Cragle testified that as of June 22, 2016—the second day of this hearing—OCTG's current net worth was approximately negative $65,000. Cragle made this determination based on updated accounts receivable and cash numbers.

Next, OCTG called David Forrest, a certified public accountant, as a witness. Forrest participated in the outside review of OCTG's financials in 2013. Forrest testified that under GAAP, a contingent liability that is probable to occur would be recorded as a liability on a balance sheet. Forrest further testified that the contingent liability must have been incurred prior to the date the financial statement was prepared. Based on his understanding of the facts and circumstances surrounding the judgment in this case, Forrest stated it was his opinion that the judgment must be included in the calculation of OCTG's net worth as of December 31, 2015.

Forrest also testified that if OCTG is preparing a "stand-alone" financial statement, it would include any liabilities to related companies. Forrest stated that both assets and liabilities concerning related companies would be recorded as if dealing with a third party.

On cross-examination, Forrest conceded that he had no opinion as to the accuracy of any financial documents produced by OCTG after 2013. According to Forrest, a company's net worth is the remaining financial position of the company after taking into consideration all of its assets less all of its liability.

Finally, Laguna called Brent Bersin, also a certified public accountant, as its sole witness. Bersin also testified as a rebuttal expert in the underlying trial as to defendants' counterclaim of damages. Bersin first addressed his understanding of the organizational structure of OCTG and its affiliates based on his review of their financial statements. Bersin stated there are essentially five "sister companies" or affiliates, all of which are ultimately owned by three individuals: Siverling, McWhorter, and Cragle. Bersin explained that ZEN Oil and Tubular, which have 50/50 ownership interest in OCTG, are affiliates and holding companies whose only purpose is to hold intercompany liabilities.

Contrary to Cragle's testimony, Bersin testified that a bank lender would not explicitly ask for consolidated financial statements. Rather, a bank would likely ask for financial statements in accordance with GAAP. Because OCTG and affiliates meet certain requirements under GAAP—namely, common ownership and business between the companies—they are required to prepare consolidated financial statements to comply with GAAP.

Again, using OCTG's own financial statements, Bersin culled out the individual entities and determined that OCTG is the "main operating entity" and has most of the assets and liabilities. Sojourn and Tejas are "pseudo-operating entities" which generate limited revenue. And Tubular and ZEN Oil are strictly holding companies and produce no revenue.

After Laguna objected to OCTG's January 2016 summary balance sheet, OCTG produced a detailed version. According to Bersin, the approximately $6.5 million OCTG lists as a long-term liability due to affiliates is all intercompany liabilities. The additional long-term liability noted as "other long-term payables" includes the $3.2 million judgment from the underlying case. Bersin explained that the intercompany liabilities are essentially zeroed out in the consolidated financial statements because the companies are required to eliminate any transactions or liabilities or receivables that are not to third parties or unrelated partners because "it's just different pots of the same pan." In light of this, Bersin stated that he did not believe these liabilities should be considered in calculating OCTG's net worth.

Bersin stated that he could not give an opinion as to whether OCTG's consolidated financial statements conform with GAAP, but he would assume as much. He also would not disagree with Forrest that under GAAP accounting standards, the judgment liability from the underlying case should be included for transparency purposes with regard to third-party lenders or investors. However, Bersin stated that from an economic or financial analytical perspective, it seems illogical to include the judgment debt in the calculation of net worth. Bersin also opined that one cannot look at OCTG as a standalone entity because there are so many intercompany loans and transactions that one needs to look at the "whole picture."

Bersin also addressed the noticeable decrease in OCTG's net worth between May 2015 and January 2016. Part of that was due to the $3.2 million judgment. Additionally, OCTG had some operating losses. Finally, the loan or liability due to Sojourn increased from $1.9 million to $3.2 million. Bersin also testified that OCTG produced two different balance sheets for May 2015, and there was a difference of $700,000 in the amounts listed for total equity.

On cross-examination Bersin emphasized that he agreed OCTG's net worth should be calculated based on OCTG's standalone financial statement. However, Bersin believed adjustments to the calculation were necessary given that OCTG is inextricably linked to its affiliates. Bersin conceded that under GAAP, intercompany liabilities are recorded in the financial statements of individual business entities.

### C. Order on Supersedeas

On July 13, 2016, the trial court ordered the amount of supersedeas bond, deposit, or security necessary for OCTG to supersede the court's judgment set at $1,874,556.05. This figure is comprised of $1,562,127.00 in actual damages awarded to Laguna, plus $181,646.08 in prejudgment interest, plus 18 months of post-judgment interest of $130,782.97 on the subtotal of $1,743,773.08. In reaching its decision, the court made the following findings:

1. OCTG has failed to carry its burden to prove the net worth asserted in the Affidavit of David Cragle and presented by OCTG at the evidentiary hearing.

2. OCTG's current net worth is $9,538,301.

3. OCTG has assets of $13,008,541.

4. OCTG has liabilities of $3,470,240.

5. Although OCTG claimed it has liabilities of $13,234,140 and assets of $13,571,416, OCTG's calculations improperly include this Court's Judgment and various payables to and receivables from its affiliates.

6. The Judgment at issue is not properly includable in liabilities for calculating net worth under Appellate Rule 24.2. Accordingly, that reduces the amount of OCTG's stated liabilities by $3,220,008.

7. Further, $6,544,005 of OCTG's claimed liabilities and $562,875 of OCTG's claims assets are so-called "intercompany" liabilities and assets. Intercompany liabilities and assets do not represent actual liabilities or assets but are, instead, accounting entries that are eliminated under GAAP when reporting the actual financial condition of closely held companies that must consolidate their financial statements. OCTG and its affiliates are closely held companies with the same three beneficial owners: David Cragle, David Siverling, and Bill McWhorter. Accordingly, under GAAP, they must consolidate their financial statements and make adjustments for intercompany liabilities and assets.

8. Subtracting the Judgment and intercompany liabilities from OCTG's stated balance-sheet liabilities of $13,234,140 leaves actual liabilities for purposes of this net-worth calculation of $3,470,240. Likewise, subtracting intercompany assets from OCTG's stated balance-sheet assets of $13,571,416 leaves actual assets for purposes of this net-worth calculation of $13,008,541.

9. Subtracting adjusted liabilities from adjusted assets yields OCTG's net worth of $9,538,301.

10. Further, after considering the evidence, the Court finds that OCTG

has failed to produce evidence sufficient to support its Motion to Reduce Supersedeas Bond Based on Substantial Economic Harm under Texas Rule of Appellate Procedure 24.2(b). Although there was testimony alleging a hardship, there was no or insufficient corroborating evidence offered to substantiate those claims for hardship.

## II. STANDARDS OF REVIEW

Rule 24 authorizes a trial court to "make any order necessary to adequately protect the judgment creditor against loss or damage that the appeal might cause." Tex. R. App. P. 24.1(e). To stay enforcement of a judgment for the recovery of money, the appellant must post security in "at least the amount of the judgment, interest for the estimated duration of the appeal, and costs." Tex. R. App. P. 24.2(a)(1); *see* Tex. Civ. Prac. & Rem. Code Ann. § 52.006(a) (containing similar language). A court of appeals may review the amount of security required to suspend enforcement of the judgment upon the request of any party. *See* Tex. R. App. P. 24.4(a)(1).

■ The trial court's determination of the net worth of a judgment debtor is reviewed under Rule 24.4 of the Texas Rules of Appellate Procedure using an abuse-of-discretion standard. *Ramco Oil & Gas, Ltd. v. Anglo Dutch (Tenge) L.L.C.*, 171 S.W.3d 905, 910 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Generally, the test for abuse of discretion is whether the trial court acted without reference to any guiding rules and principles or whether the trial court acted arbitrarily and unreasonably. *See McDaniel v. Yarbrough*, 898 S.W.2d 251, 253 (Tex. 1995). However, a trial court has no discretion in determining what the law is and applying the law to the facts. *See Gonzalez v. Reliant Energy, Inc.*, 159 S.W.3d 615, 623–24 (Tex. 2005). A

failure by the trial court to analyze or apply the law correctly is an abuse of discretion. *Id.*

## III. ANALYSIS

OCTG includes four challenges in its motion, arguing the trial court abused its discretion by: (1) ordering OCTG to post security for prejudgment interest, which need not be secured under Texas law; (2) eliminating from its net-worth calculation OCTG's payables to affiliates, which are properly included in a net-worth calculation under controlling GAAP standards; (3) not including in its net-worth calculation the judgment against OCTG, which is properly included in a net-worth calculation under controlling GAAP standards; and (4) finding that OCTG had not met its burden regarding substantial economic harm.

### A. Prejudgment Interest

■ OCTG first contends the trial court erred by requiring OCTG to post security of $181,646.08 for prejudgment interest. As discussed above, during the evidentiary hearing, Cragle testified that the balance sheet he prepared with OCTG's net-worth affidavit included "the amount of the judgment, prejudgment interest, costs and legal fees associated with the case." We conclude Cragle's affirmative statement in the trial court that the prejudgment interest should be included in determining the company's net worth precludes OCTG from arguing the trial court abused its discretion with regard to this issue.

### B. Payables to Affiliates

■ OCTG also contends the trial court abused its discretion in eliminating OCTG's payables to affiliates from its net-worth calculation since these were properly included under controlling GAAP standards.

■ The trial court is required to set the net worth of each individual debtor. "In setting the amount of supersedeas security pending appeal, the trial court is required to consider the separate financial condition of each judgment debtor." *G.M. Houser, Inc. v. Rodgers*, 204 S.W.3d 836 (Tex. App.—Dallas 2006, op. on motion); *see also* Tex. R. App. P. 24.2(c) (when creditor contests a judgment debtor's net worth affidavit, court "must issue an order that states the debtor's net worth and states with particularity the factual basis for that determination").

Both parties agree that the judgment debtor's net worth must be calculated by subtracting its total liabilities from total assets in accordance with GAAP and *Ramco*. However, the parties disagree as to how that calculation is effectuated. OCTG argues that its *individual* balance sheet properly includes payables and receivables to its affiliated companies. Laguna does not dispute this but contends that under GAAP, OCTG is required to consolidate its financial statement with its affiliates and use eliminating journal entries because liabilities owed to or payable from an affiliate are not real debts or assets.

We acknowledge that courts have generally stated that "net worth" is calculated as the difference between the party's total assets and total liabilities as determined by GAAP. *See Ramco Oil*, 171 S.W.3d at 914. *See also In re Williams*, 328 S.W.3d 103, 110 (Tex. App.—Corpus Christi–Edinburg 2010, orig. proceeding); *Texas Custom Pools, Inc. v. Clayton*, 293 S.W.3d 299, 305 (Tex. App.—El Paso 2009) (opinion on motion); *EnviroPower, L.L.C. v. Bear, Stearns & Co., Inc.*, 265 S.W.3d 1, 5 (Tex. App.—Houston [1st Dist.] 2008, order); *LMC Complete Automotive, Inc. v. Burke*, 229 S.W.3d 469, 482 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

However, we have held previously that the GAAP consolidation rule does not displace the legal requirement that the net worth of each individual judgment debtor must be determined separately; and that, absent an alter ego finding, a court abuses its discretion by using a consolidated financial statement to determine the individual judgment debtor's net worth. *Hunter Buildings & Mfg. L.P. v. MBI Global, L.L.C.*, 514 S.W.3d 233, 238 (Tex. App.—Houston [14th Dist.] 2016, order). In this case, there has been no finding of alter ego or that OCTG's payables to affiliates are not genuinely based on value that OCTG received. Using the GAAP consolidation rule would be impermissibly commingling all of the assets of all of the companies, as if there had been a finding of alter ego. *See In re Smith*, 192 S.W.3d 564, 568–69 (Tex. 2006) (holding alter ego finding in a post-judgment net worth proceeding is relevant to the determination of a judgment debtor's net worth for the purposes of Rule 24 but may not be used to enforce the judgment against the unnamed alter ego or any other non-judgment debtor). We conclude it was error for the trial court to eliminate OCTG's payables to affiliates from its net-worth calculation based on the GAAP consolidation rule.

### C. Judgment

■ OCTG next contends the trial court improperly excluded the judgment in the underlying case from its net-worth calculation. OCTG argues that under GAAP, this type of contingent liability must be accrued and recorded in its financial statements because it is both "probable" and "can be reasonably estimated." OCTG cites *Ramco* in support of its argument, relying on this court's holding that the proper way to calculate net worth under Rule 24 is to calculate "the difference between total assets and total liabilities determined in accordance with GAAP." 171 S.W.3d at 914.

However, cases out of our sister courts that were decided following *Ramco* have held the trial court does not abuse its discretion by excluding the judgment from its net worth calculation, noting that "the plain language of the statute does not include a contingent money judgment in calculating net worth." *Bus. Staffing, Inc. v. Jackson Hot Oil Serv.*, 392 S.W.3d 183, 187–88 (Tex. App.—El Paso 2012, order); *McCullough v. Scarbrough, Medlin & Associates, Inc.*, 362 S.W.3d 847, 849 (Tex. App.—Dallas 2012, order); *Anderton v. Cawley*, 326 S.W.3d 725, 726–27 (Tex. App.—Dallas 2010, order). OCTG contends these cases are not controlling because they conflict with *Ramco*.

OCTG fails to cite any authority supporting its contention that the judgment *must* be included in the net worth calculation; indeed, it conceded at the hearing that it is unaware of any such authority. Both parties offered testimony during the hearing as to whether the judgment should be included. As the fact finder, the trial court is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *GTE Mobilnet of S. Tex. v. Pascouet*, 61 S.W.3d 599, 615–16 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). In light of the evidence before the trial court and absent any authority to the contrary, we cannot say the trial abused its discretion in excluding the judgment. *See also Montelongo v. Exit Stage Left, Inc.*, 293 S.W.3d 294, 299 (Tex. App.—El Paso 2009, op. on motion) (concluding that trial court did not abuse its discretion in excluding the amount of the judgment itself in determining liabilities).

### D. *Economic Harm*

OCTG asserts that the trial court abused its discretion by finding that OCTG failed to show substantial economic harm. We disagree.

The Texas Supreme Court has recognized, in certain instances, that the general rule requiring bond or other security in the total amount of a money judgment may effectively deny an appellant the right to appeal. *Isern v. Ninth Court of Appeals*, 925 S.W.2d 604, 606 (Tex. 1996) (orig. proceeding); *McDill Columbus Corp. v. Univ. Woods Apts.*, 7 S.W.3d 923, 925 (Tex. App.—Texarkana 2000, no pet.). To guard against that possibility and yet protect the judgment creditor's right to collect its judgment, the supreme court amended the appellate rules to provide for reduced or alternate security. *Isern*, 925 S.W.2d at 605; *In re Kajima Intern., Inc.*, 139 S.W.3d 107, 111 (Tex. App.—Corpus Christi 2004, orig. proceeding). The party seeking alternate security bears the burden of proving the "substantial economic harm to debtor" and "no substantial impairment to creditor" requirements imposed by Rule 24.2(b). *McDill Columbus*, 7 S.W.3d at 925. Whether OCTG is likely to suffer substantial economic harm is a question of fact that we review for abuse of discretion. *Ramco*, 171 S.W.3d at 918.

Here, the trial court found there was insufficient evidence to support OCTG's contention that it would suffer substantial economic harm by posting the additional security required. Although Cragle testified as an interested witness that there would be harm, the trial court found there was no or insufficient corroborating evidence offered to substantiate the claim. The record supports this finding.

### IV. Conclusion

After reviewing the record as a whole, we conclude it was error for the trial court to eliminate OCTG's payables to affiliates from its net-worth calculation. To this extent, we grant, in part, OCTG's Rule 24.4(a) motion. We deny all other requested relief. Therefore, we reverse the trial

court's order on supersedeas, in part, and remand for a new net-worth determination in accordance with this opinion. Our order of August 2, 2016, staying execution of the judgment in trial court cause number 2013-44749, styled *Laguna Tubular Products Corporation and LTP Real Estate, LLC F/K/A LTP Real Estate Inc., v. O.C.T.G., L.L.P. and Sojourn Partners, L.L.C.,* is vacated and our stay is lifted.